UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STEVEN D. SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-04004-SEB-MPB |
| | ) | |
| ALLSTATE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 40], filed on March 2, 2020, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.  Plaintiff Steven Sanders brings this action against his former employer, Defendant Allstate Insurance Company ("Allstate"), alleging that he was terminated because of his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*  Mr. Sanders alleges that younger employees were treated more favorably by Allstate, and that Allstate failed to follow its own disciplinary policy when it terminated his employment.  Allstate denies these allegations and maintains that it terminated Mr. Sanders for a nondiscriminatory reason and that his termination was in line with its disciplinary policy.  For the reasons that follow, we GRANT Allstate's Motion for Summary Judgment.[1]

---

[1] On May 4, 2020, Plaintiff filed a Motion for Leave to File Surreply [Dkt. 75] in order to address new arguments raised in Defendant's reply in support of its motion for summary judgment.  That motion is GRANTED.

## Factual Background

### I.     The History of Mr. Sanders's Employment at Allstate

Mr. Sanders began working for Allstate in 1986 and was most recently employed as a Claim Service Leader ("CSL").  Sanders Dep. at 68:9-24.  At all times relevant to this litigation, Mr. Sanders reported to Cary Soileau, a Regional Claim Leader ("RCL").  *Id.* at 51:8-14, 52:8-18.  Mr. Soileau, in turn, reported to Dan Sherban, the Senior Claim Field Director.  *Id.* at 33:2-3; Sherban Decl. ¶ 2.

In each of his annual performance reviews from 2012 to 2017, Mr. Sanders received an "Expected" rating.  Ex. 3, at 7; Ex. 4, at 12; Ex. 5, at 14; Ex. 6, at 19; Ex. 7, at 15; Ex. 105, at 12.  Mr. Sanders also received additional praise on certain reviews, including in 2017, when Mr. Soileau stated that Mr. Sanders "exhibited solid leadership skills."  Ex. 105 at 6.  Mr. Sanders was considered by some Allstate employees to be "very personable," and he was regarded by certain co-workers as the "dad of the office."  Zimmer Dep. at 7:7-12.

However, Mr. Sanders also occasionally received negative feedback.  In 2015, Mr. Sanders was encouraged to "work on being empathetic in all interactions."  Ex. 6, at 12.[2]

---

[2] Mr. Sanders's 2015 performance review indicates that it was "observed" in January of that year that Mr. Sanders "need[ed] to work on being empathetic in all interactions."  Ex. 6 at 12.  The review reflects that, in response to that critique, Mr. Sanders stated: "I don't believe 1 comment in 1 meeting should lead to being rated off target.  I explained to Cary [Soileau] what I meant to say when I said it.  He said he understood where I was going.  I don't have any ratings for the other 5 leadership principles."  *Id.*  Mr. Sanders was given a chance to improve in this respect and, in July 2015, it was noted that "[t]here [was] a noticeable difference" and his "interactions with others [had] significantly improved."  *Id.*

Mr. Sanders acknowledged that he received feedback on his behavior with employees in 2014 or 2015, but he was given a chance to improve his behavior and did so.  Sanders Dep. at 73:24-74:12.[3]  According to Mr. Sanders, outside of this counseling, he never received any discipline in his thirty-two-year career at Allstate.  Sanders Decl. ¶ 52.

## II.      The December 4, 2017 Meeting

Throughout Mr. Sanders's tenure with Allstate, the leadership staff attended weekly meetings led by the CSLs.  On December 4, 2017, at one of these regularly scheduled meetings, Mr. Sanders spoke about the need for more of the leadership staff to sign up to interview potential Allstate employees.  Sanders Dep. at 28:21-25; 29:22-30:24.  Mr. Sanders explained that, because an insufficient number of leaders had been signing up for interview slots, when potential employees arrived for interviews, there often was no one scheduled or available to conduct those interviews.  *Id.* at 30:20-31:2.  Although Mr. Sanders had sent multiple emails to leadership staff in advance of the meeting addressing the need to fill the open slots, even after "reminder after reminder, after reminder," he still had not secured a sufficient number of volunteers, despite his having dedicated significant time toward these efforts.  *Id.* at 32:4-23.

---

[3] Mr. Sanders disputes this fact because he does not recall the conversation or what it was about. Sanders Dep. at 61:2-8, 74:16-20.  However, Mr. Sanders acknowledges that something was brought to his attention "three years or so prior" to the December 4, 2017 meeting or his February 28, 2018 termination—the record is not clear—and that he subsequently improved.  *Id.* at 73:24-74:15.  As noted above, Mr. Sanders also acknowledged feedback from Mr. Soileau in 2015 and thereafter improved.  Ex. 6, at 12.

According to Mr. Sanders's supervisor, Mr. Soileau, who was present at the December 4, 2017 meeting, Mr. Sanders twice shouted, "do your goddamn job," very loudly during the meeting while imploring leaders to fill the open interview slots. Soileau Dep. at 14:16-15:1.  Mr. Soileau recounts that Mr. Sanders yelled and cursed at everyone in the room, causing the meeting attendees to be "frozen" because of "[a] fear of what [Mr. Sanders] was going to do next." *Id.* at 14:9-15:6.  No one said anything during the meeting to Mr. Sanders about the incident, but Mr. Soileau recalls having asked him after the meeting had adjourned "what he thought he was doing by having that kind of outburst in the meeting." *Id.* at 16:18-17:6.  According to Mr. Soileau, Mr. Sanders then apologized, and Mr. Soileau coached him telling him that "it was inappropriate to do that." *Id.* at 17:7-19.  Mr. Soileau never reported this incident, however. *Id.* at 17:22-23.

Mr. Sanders denies that he acted inappropriately at the meeting.  Pl.'s Resp. at 6. Mr. Sanders does not recall yelling and shouting; rather, he claims that, if anything, he merely was talking loudly because it was a large room.  *See* Sanders Dep. at 27:4-9.  Mr. Sanders also denies that Mr. Soileau ever coached him that his behavior at the meeting was inappropriate.  Sanders Dep. at 73:13-23.  Amber Zimmer, another member of Allstate's leadership staff in attendance at the meeting, corroborates Mr. Sanders's statement that he did not yell or act inappropriately and, further, that she did not feel threatened by him.  Zimmer Dep. at 11:11-21.

## III.    Allstate's Investigation of the Alleged Incident

After receiving an anonymous complaint on or about December 30, 2017, Allstate's Centralized Employee Relations Team ("CERT") opened an investigation into Mr. Sanders's conduct at the December 4, 2017 leadership meeting.  Martin Decl. ¶ 3.  A CERT representative, Lynn Travis, contacted Mr. Soileau about the complaint.  *Id.* ¶ 4. Mr. Soileau stated that he had coached Mr. Sanders on the issue and considered it resolved.  *Id.*; Soileau Dep. at 25:20-26:3.  Following this interview, on January 3, 2018, the initial investigation was closed without further action.  Martin Decl. ¶ 5.

In late January 2018, the individual who apparently lodged the earlier anonymous complaint again contacted CERT, this time revealing her identity as Amber Boone, a Team Lead, who stated that her concerns regarding Mr. Sanders's behavior had not been resolved.  *Id.* ¶ 6.  Shortly thereafter, in early February 2018, Ms. Boone also contacted Director Dan Sherban, Mr. Soileau's supervisor.  Ms. Boone, who reportedly did not like Mr. Sanders,[4] was not in attendance at the December 4 meeting, but told Mr. Sherban, that she had heard reports that Mr. Sanders acted in an intimidating and degrading manner, cursed, yelled, and screamed.  Sherban Decl. ¶ 3.  After this conversation, Mr. Sherban contacted CERT regarding Ms. Boone's concerns and CERT Associate Manager Suzette Martin was assigned to investigate the renewed complaint.  *Id.* ¶ 4; Martin Decl. 6.  Mr. Sherban had no further involvement in the investigation.

---

[4] Ms. Zimmer testified that Ms. Boone did not like Mr. Sanders.  Zimmer Dep. at 14:18-20.  Mr. Sanders likewise stated in his declaration that Ms. Boone did not like him and was upset about an independent incident in which he had disciplined her.  Sanders Decl. ¶¶ 15-17.

Ms. Martin interviewed nine members of the Indianapolis leadership team, all of whom had attended the December 4, 2017 leadership meeting.  Martin Decl. ¶ 7; Sherban Decl. ¶¶ 5-6; Ex. A.  According to Ms. Martin, the majority of the individuals she interviewed reported that Mr. Sanders was very angry and that he yelled and cursed at employees during the December 4, 2017 meeting.  Martin Decl. ¶ 7.  However, at least one employee Ms. Martin interviewed stated that Mr. Sanders was merely speaking passionately and did not curse or yell.  That employee reported that she was unconcerned by Mr. Sanders's behavior and that she did not feel his delivery was inappropriate.  Dkt. 56 at 2.  Ms. Zimmer, another Allstate employee who had attended the meeting and was supportive of Mr. Sanders, was not interviewed about the incident.  Zimmer Dep. at 11:22-25.

Mr. Sanders was among those interviewed by Ms. Martin and another CERT representative.  Sanders Dep. at 21:23-25, 24:5-25:3.  According to Mr. Sanders, the CERT representatives asked him if he ever said "damn it" or "goddamn it," and he responded that he did not remember if he used those words at the meeting.  *Id.* at 25:5-11. Mr. Sanders was also asked if he yelled or shouted at the meeting, and he responded that he did not believe he had done so.  *Id.* at 26:22-27:10.

After concluding her investigation, Ms. Martin summarized her findings in a telephone or Skype conversation with Mr. Sherban.  Martin Decl. ¶ 8; Sherban Decl. ¶ 5. At the conclusion of her summary, Ms. Martin recommended that Mr. Sherban either

terminate Mr. Sanders's employment or issue him a final written warning.  Martin Decl. ¶ 8; Sherban Decl. ¶ 5.[5]

## IV.    Mr. Sanders's Termination

According to Mr. Sherban, he was the "ultimate decision-maker" with respect to whether to terminate Mr. Sanders's employment.  Sherban Decl. ¶ 5.  Based on Ms. Martin's findings, he determined that Mr. Sanders's conduct at the December 4, 2017 meeting was "an egregious violation of Allstate's Code of Business Conduct."  *Id.*  Based on his understanding of Mr. Sanders's conduct, he "los[t] confidence in Mr. Sanders's ability to be an effective leader."  *Id.*  Accordingly, he decided to terminate Mr. Sanders's employment.

Ms. Martin sent Mr. Sherban a Termination Request letter, which stated that Mr. Sanders's conduct violated HR Policy Guideline chapter 14, the Code of Business Conduct, and "caused management to lose confidence in [Mr. Sanders's] ability to perform his job."  Sherban Decl. ¶ 6; Ex. A.  Mr. Sherban approved the request on February 23, 2018, thereafter directing Mr. Soileau to effectuate the termination. Sherban Decl. ¶ 6; Ex. A.  Mr. Sherban also cited Mr. Soileau for failing to stop Mr.

---

[5] A report prepared by Ms. Martin following her investigation into Ms. Boone's complaint titled, "An Interview Feedback Summary Report," states, in a section labeled "recommendations," that an Unacceptable Notification ("UN") "could be warranted" in Mr. Sanders's case, "however there is a concern that there was little accountability prior to this so a UN at this time may skip the progressive disciplinary procedures."  Dkt. 53 at 0001584.  Ms. Martin states that this summary was prepared "just in case" something formal was required in writing for Mr. Sherban.  *Id.* at 0001581.  However, there is no allegation nor any indication in the record that Mr. Sherban was ever provided this formal, written report.  *Id.*

Sanders's alleged behavior or otherwise address it during the meeting.  Sherban Decl. ¶ 7;
Ex. B; Soileau Dep. at 20:5-18.

On February 28, 2018, Allstate terminated Mr. Sanders's employment.  Sanders
Dep. at 19:16-22; 70:2-8.  Mr. Soileau informed Mr. Sanders that he was being
terminated for intimidation.  Sanders Dep. at 19:24-20:12.  At the time of his termination,
Mr. Sanders was fifty-seven years of age.  Sanders Decl. ¶ 46.  Of the eighteen leadership
employees at his Allstate office, he was the second oldest.  *Id.* ¶ 53.

Mr. Sanders disputes that Mr. Sherban was the ultimate decisionmaker with regard
to his termination.  Mr. Sanders contends that Mr. Sherban did not act alone, because it
was Mr. Soileau who actually administered the termination and signed off on a document
sent to him by CERT and Mr. Sherban.  Soileau Dep. at 27:11-15.  Furthermore, Mr.
Sanders maintains that any termination must go through CERT/HR for approval.  Sanders
Dep. at 43:25-44:2.  Allstate concedes that Mr. Sanders's termination was "approved by
HR."  Sherban Decl. ¶ 6; Ex. A.  However, Mr. Soileau, Ms. Martin, and Mr. Sherban all
have testified that it was Mr. Sherban who made the decision to terminate Mr. Sanders's
employment.  Soileau Dep. at 22:9-11; Martin Decl. ¶ 9; Sherban Decl. ¶ 5.

## VI.    Allstate's Employment Policies

Mr. Sanders alleges that Allstate violated its own disciplinary policy when it
terminated him.  Allstate's HR Policy Guideline chapter 14 provides that "[e]mployment
will not be terminated for unacceptable job performance/behavior, unless an employee
has been advised that his/her behavior is unacceptable."  Ex. 2, at 0000577 ("HR

Policy").  Mr. Sanders asserts that he has never been counseled about unacceptable performance or behavior, and that he was not given a chance to improve his performance or behavior.  Sanders Decl. ¶¶ 50-51.

Allstate, on the other hand, argues that it did in fact follow its disciplinary policy when it terminated Mr. Sanders.  In support of this contention, Allstate points out that its employees are terminable at will.  HR Policy at 0000576.  It also cites to the section labeled "Conduct Leading to Immediate Termination," (*id.* at 0000577), which lists "certain situations which warrant a departure from normal procedures," including: "[v]iolation of other Company rules, regulations, or policies, including the Allstate Code of Ethics" and "[c]onduct which causes management to lose confidence in the employee's ability to perform his/her job or which adversely reflects upon or affects Allstate or its employees."  *Id.* at 0000578.

Under Allstate's Code of Business Conduct,[6] which form Mr. Sanders signed every year, (Sanders Dep. at 37:18-24; Ex. 1), Allstate managers are expected to foster a respectful workplace by avoiding "behavior that could be considered degrading or intimidating to others."  Sanders Dep. at 39:7-40:4; Ex. 1, at 0000176, 0000183.  In his declaration, Mr. Sherban stated that he determined Mr. Sanders's behavior was an egregious violation of the Code of Business Conduct that caused him to lose confidence

---

[6] Allstate's Code of Business Conduct is also referred to as the "Code of Ethics." Sherban Decl. ¶ 5.

in Mr. Sanders's ability to be an effective leader.  Therefore, Allstate maintains that its

termination of Mr. Sanders complied with its HR Policy.

## VII.   Mr. Sanders's Proffered Comparators

In addition to the alleged deviation from the HR Policy, Mr. Sanders contends that

he was treated more harshly than his younger colleagues.  Specifically, he alleges that

Amber Boone, Michael Baker, Amanda Mosier, Deborah Jackson, Brad Schaefer, and

Amber Zimmer were all given warnings or a chance to improve when their behavior was

found to be unacceptable, instead of being fired, as Mr. Sanders was.

Mr. Sanders's initial proffered comparator is Ms. Boone, a Team Leader in her

mid-thirties.  Dkt. 59 at 0001742.[7]  In February 2019, CERT conducted spot-check

interviews to investigate multiple complaints regarding her leadership style, who

reportedly "intimidate[d]" employees, yelled at them, and slammed or threw items onto

her desk.  *Id.*  The majority of those interviewed said that Ms. Boone's behavior was

demeaning, disrespectful, and created an unhealthy work environment.  *Id.*  Based on

those interviews, CERT recommended "strong coaching" and advised that "any

continuation of this behavior could lead to an Unacceptable Notification and/or

termination for behavior."  *Id.* at 0001744.  In August 2019, following Ms. Boone's

continued engagement in inappropriate and unprofessional behavior, she was issued an

Unacceptable Notification, which was approved by Ms. Martin. Dkt. 60, at 0001672-

---

[7] Mr. Sanders alleges that Ms. Boone is in her mid-thirties, citing to DOE 110, but neither that document nor any other evidence in the record contains any reference to Ms. Boone's age. *See* Dkt. 59.

1673; Dkt. 65, at 0001880.  There is no indication that Mr. Sherban was involved in any way in the decision to discipline rather than terminate Ms. Boone.[8]

Mr. Sanders's next proffered comparator is Michael Baker, a CSL in his mid-forties.[9]  Mr. Baker received a coaching after he yelled at an employee in the workplace in 2018. Dkt. 67, at 0001682.  Mr. Soileau recommended coaching for Mr. Baker, Dkt. 66, at 0001678; however, there is no evidence in the record, and Mr. Sanders does not allege, that Mr. Sherban was involved in the decision to discipline Mr. Baker.

As Mr. Sanders's third proffered comparator, he points to Amanda Mosier, a Claims Team Leader in her mid-thirties.[10]  Ms. Mosier reportedly yelled in the face of another employee.  Dkt. 68. CERT recommended that Ms. Mosier be coached about treating others with dignity and respect.  Dkt. 77.  CERT representative Lynn Travis and CSL Michael Baker were involved in the discipline of Ms. Mosier, but there is no

---

[8] Plaintiff asserts that "Suzette Martin, the individual from CERT who made the discipline decision about Mr. Sanders, also approved Ms. Boone's [Unacceptable Notification]." Pl.'s Resp. ¶ 70. Plaintiff cites to DOE 116 in support of this proposition; however, DOE 116 shows only that Suzette Martin approved the Unacceptable Notification for Ms. Boone. *See* Dkt. 65. Plaintiff's statement that Suzette Martin "made the discipline decision about Mr. Sanders" is merely conclusory.

[9] Mr. Sanders alleges that Mr. Baker is in his mid-forties, citing to DOE 117 and DOE 118. DOE 117 is a document showing that Mr. Soileau recommended coaching for Mr. Baker, but contains no reference to his age.  Dkt. 66, at 0001678.  DOE 118 is a LinkedIn Profile apparently belonging to Mr. Baker, which does not contain his age but does indicate that he graduated high school in 1997.  Ex. 118.

[10] Mr. Sanders alleges that Ms. Mosier is in her mid-thirties, citing to DOE 120 and DOE 121. DOE 120 is a document showing that a conversation was scheduled with Ms. Mosier to discuss an incident in which she apparently yelled in the face of another employee, but it contains no reference to Ms. Mosier's age.  Dkt. 68.  DOE 121 is an email chain which appears to show a conversation in which Mr. Soileau reported to CERT a complaint from the employee at whom Ms. Mosier yelled, but there is again no mention of Ms. Mosier's age.  Dkt. 69.

evidence in the record indicating that Mr. Sherban, Mr. Soileau, or Ms. Martin was involved in any way. *See* Dkt. 70.

Fourth, Mr. Sanders proffers Deborah Jackson, a Team Leader in her early to mid-forties,[11] as a comparator. Ms. Jackson mistakenly sent an email in which she referred to another employee as a "heifer" directly to the employee to whom she was referring. Sanders Dep. at 77:25-78:6. Ms. Jackson received a written warning. *Id.* at 78:15-79:7. Again, there is no evidence in the record indicating, and Mr. Sanders does not allege, that Mr. Sherban, Mr. Soileau, or Ms. Martin was involved in the discipline of Ms. Jackson.

Mr. Sanders's next proffered comparator is Brad Schaefer, a Team Leader in his late thirties. *Id.* at 17:23-18:4.[12] Mr. Schaefer received a written warning for failing to effectively manage his team. *Id.* at 79:20-80:14, 82:13-21. Mr. Schaefer reported to Mr. Sanders, and Mr. Sanders made the decision to discipline him after consulting with Mr. Soileau. *Id.* at 80:15-81:17. There is no evidence in the record to suggest that Mr. Sherban or Ms. Martin was involved in the decision to discipline Mr. Schaefer.

Finally, Mr. Sanders offers Ms. Zimmer, a Team Leader in her early thirties,[13] as an appropriate comparator. *Id.* at 18:14-23. Ms. Zimmer was issued a formal warning for failure to effectively manage her team. *Id.* at 83:12-84:13. Ms. Zimmer reported

---

[11] Mr. Sanders stated in his deposition that he believes Ms. Jackson to be in her early forties. Sanders Dep. at 16:17-22. There is no other evidence in the record to corroborate this assertion.
[12] Mr. Sanders stated in his deposition that he believed Mr. Shaefer is in his late thirties. Sanders Dep. at 18:3-4. There is no other evidence in the record to corroborate this claim.
[13] In his deposition, Mr. Sanders stated that he believed Ms. Zimmer is "probably about 33 or 34 years old." Sanders Dep. at 18:14-16. There is no other evidence in the record to corroborate this claim.

directly to Mr. Sanders, and he disciplined her after consulting with Mr. Soileau. *Id.* at 18:14-21, 84:8-13. There is no evidence in the record that indicates that Mr. Sherban or Ms. Martin was involved in the decision to discipline Ms. Zimmer.

## VIII.  The Instant Litigation

Mr. Sanders filed a timely Charge of Discrimination against Allstate with the Equal Opportunity Employment Commission ("EEOC") on August 15, 2018. On September 25, 2018, the EEOC issued Mr. Sanders a Right to Sue. He has brought this action alleging that his termination by Allstate constituted age discrimination under the ADEA. We address this claim below.

## Legal Analysis

## I.  Summary Judgment Standard

Allstate has filed its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(a). "Summary judgment is proper if the moving party 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, we "consider all of the evidence in the record in the light most favorable to the

non-moving party, and we draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Feliberty v. Kemper Corp.*, 98 F.3d 274, 276-77 (7th Cir. 1996) (citation omitted).

## II.    Discussion

"The ADEA protects workers 40 years of age and older from age-based discrimination." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018). In relevant part, the Act makes it unlawful for an employer to "discharge any individual [over forty years of age] . . . because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff asserting a disparate treatment claim under the ADEA, as Mr. Sanders does here, must "prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Carson v. Lake County*, 865 F.3d 526, 532 (7th Cir. 2017) (citations omitted).  "In this respect, the ADEA is narrower than Title VII of the Civil Rights Act of 1964, as Title VII also protects against mixed-motive discrimination." *Id.* (citation omitted).

Mr. Sanders may successfully carry this burden by presenting direct or circumstantial evidence that Allstate terminated him because of his age.  *Wrolstad*, 911 F.3d at 454.  Alternatively, Mr. Sanders may proceed through the *McDonnell Douglas* burden-shifting approach.  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Under either method, the ultimate question at the summary judgment stage is whether the evidence as a whole would allow a reasonable jury to find that Mr. Sanders was terminated because of his age.  *Id.* (citations omitted).

14

Here, Mr. Sanders has chosen to proceed under the *McDonnell Douglas* burden shifting framework.  Pl.'s Resp. at 17.  Accordingly, we follow his lead and apply that framework in our analysis.  Under the *McDonnell Douglas* approach, a plaintiff must come forward with evidence showing that "(1) [he] is a member of a protected class, (2) [he] was meeting the defendant's legitimate expectations, (3) [he] suffered an adverse employment action, and (4) similarly situated employees who were not members of [his] protected class were treated more favorably."  *Carson*, 865 F.3d at 533 (quoting *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016)).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  If the defendant articulates a nondiscriminatory reason, the burden shifts back to the plaintiff to submit evidence indicating that the employer's stated reason is pretextual. *Id.*

### A.    Prima Facie Case of Age Discrimination

There is no dispute that Mr. Sanders is a member of the class protected by the ADEA, as he was fifty-seven years old at the time of his termination. It is also undisputed that Mr. Sanders suffered an adverse employment action when Allstate terminated his employment on February 28, 2018.  While Allstate points out that Mr. Sanders's performance and/or behavior was addressed on at least one occasion prior to the incident that led to his termination, *see* Sanders Dep. at 73:24-74:12, Allstate does not seriously contend that Mr. Sanders was not meeting its legitimate expectations—at least prior to the December 4, 2017 meeting.  Rather, in contending that Mr. Sanders has failed to

establish a prima facie case of age discrimination, Allstate primarily argues that Mr. Sanders has failed to satisfy his burden to show that similarly situated, substantially younger employees were treated more favorably than he was.

The similarly situated analysis is a "'flexible, common-sense examination' of all relevant factors." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citation omitted). "Its purpose is to eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus." *Id.* (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)).

Similarly situated employees must therefore be "directly comparable to the plaintiff in all material respects." *Id.* (citations and quotation marks omitted). However, "they need not be comparable in every conceivable way." *Id.* "We are looking for comparators, not 'clone[s].'" *Id.* (quoting *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 916 (7th Cir. 2010)). In order to allow for a meaningful comparison to determine whether intentional discrimination is at play, "[i]n the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* at 847 (citations omitted).

Although "the similarly-situated requirement 'normally entails' the existence of a common supervisor," this is not always the case, as the Seventh Circuit has explained that

"the real question is whether they were *treated more favorably* by the same *decisionmaker*." *Id.* at 847, 848 (emphasis in original) (internal quotation marks and citation omitted).  This is because "[t]he inference of discrimination is weaker when there are different decision-makers, since they 'may rely on different factors when deciding whether, and how severely, to discipline an employee.'" *Id.* (quoting *Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826 (7th Cir. 2008)).  Thus, the Seventh Circuit has held that a common decisionmaker is a necessary requirement in order to find that an employee is similarly situated.  *See Ellis*, 523 F.3d at 826 ("[T]o be similarly situated, a manager must have been treated more favorably by the same decisionmaker that fired the [plaintiff]."); *Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) (plaintiff was not similarly situated because there was no evidence the employment actions were made by the same decisionmaker and therefore the discipline of other employees "sheds no light" on the decision to discharge plaintiff).

Here, Allstate argues that Mr. Sanders has not carried his burden to show that his proffered comparators are similarly situated because he has not shown that Mr. Sherban, the ultimate decisionmaker in his case, was also the decisionmaker in their cases.  Mr. Sanders rejoins that the decision to terminate him was made, not by Mr. Sherban alone, but in consultation with others, including Mr. Soileau and CERT/HR staff members, particularly Ms. Martin, who were also involved in the decisions to discipline his proffered comparators.  For the following reasons, we are not persuaded by Mr. Sanders's argument.

It is true that Mr. Sherban consulted with Ms. Martin and CERT and chose to terminate Mr. Sanders after considering Ms. Martin's post-investigation recommendation that, based on Mr. Sanders's behavior at the December 4, 2017 meeting, he either be terminated or given a final writing warning.  However, Mr. Sherban, Mr. Soileau, and Ms. Martin all testified that Dan Sherban was the "ultimate decision-maker" in deciding to terminate Mr. Sanders.  The fact that Mr. Sherban received input from CERT before making the termination decision does not erode the conclusion that he was the ultimate decisionmaker; it merely "shows that [he] used the resources at his disposal to make an informed decision." *Ellis*, 523 F.3d at 827.  The uncontradicted evidence establishes that Ms. Martin recommended that Mr. Sherban choose either to terminate Mr. Sanders or issue an Unacceptable Notification.  It is Mr. Sherban who opted to terminate Mr. Sanders, and CERT approved that decision.  Simply presenting information gathered from an investigation, offering a real choice to the decisionmaker, and approving that decision is not the same thing as making the decision oneself.[14]

Mr. Sanders also argues that Mr. Soileau was involved in the decision because he effected the termination and signed the Termination Request.  However, Mr. Sanders has offered no evidence to show that Mr. Soileau had any final authority over the matter. In fact, when asked who made the ultimate decision to terminate Mr. Sanders, Mr. Soileau

---

[14] If the information or investigation are biased, that may be evidence of pretext—a theory which we reject below. Likewise, if the decisionmaker is not offered a real choice between the options recommended by the HR investigator, that may indicate that the HR representative was the functional decisionmaker, if not the formal one. There is no evidence here to suggest that the choice Ms. Martin offered Mr. Sherban was anything other than bona fide.

replied: "Dan Sherban." Soileau Dep. at 22:9-11.  Mr. Soileau himself received an

Unacceptable Notification for not immediately acting during the meeting to interrupt Mr.

Sanders's outburst.  *Id.* at 20:5-18.  The uncontroverted evidence before us is that Mr.

Soileau's role was merely to administer the termination as directed but not otherwise

assume responsibility for that decision.[15]

In sum, we find that the evidence establishes that Mr. Sherban was solely

responsible for the ultimate decision to terminate Mr. Sanders.  It is undisputed that Mr.

Sherban did not make the disciplinary decisions in any of the other cases involving Mr.

Sanders's proffered comparators, nor is there evidence in the record establishing that he

was aware of the specific discipline those other employees received.  On these facts, Mr.

Sanders has failed to show that similarly situated younger employees were treated more

favorably, given that his proffered comparators were not disciplined by the same

decisionmaker.  As the Seventh Circuit has ruled, "[d]ifferent decisionmakers may rely

on different factors when deciding whether, and how severely, to discipline an

employee."  *Ellis*, 523 F.3d at 826.

### B.    Pretext Inquiry

---

[15] Neither Party mentions the possibility that Ms. Boone's animus could be imputed under a "cat's paw" theory, but we agree that such a theory would not be applicable here. First, while Mr. Sanders does ascribe animus to Ms. Boone, he does not allege, nor is there evidence to show that any animus she may have held was age-based. Furthermore, Allstate conducted a meaningful and independent investigation over which Ms. Boone had no influence, which breaks any chain of causation between the complainant and the injurious conduct. *See Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015) (citations omitted).

Nor has Mr. Sanders succeeded in showing that Allstate's proffered nondiscriminatory reason for his termination, to wit, his behavior at the December 4, 2017 meeting and Mr. Sherban's resulting loss of confidence in Mr. Sanders's ability to perform his job, is pretextual.  The Seventh Circuit adheres to the "honest belief rule" and the evidence adduced by Mr. Sanders, at most, could raise doubt regarding the soundness of Allstate's decision to terminate him, but is insufficient to show that Mr. Sherban did not honestly believe the nondiscriminatory reason provided for Mr. Sanders's discharge. *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir. 1999) ("[R]egardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions.").

Mr. Sanders argues that the fact that he was not given a warning or an opportunity to improve before he was terminated, in contravention of Allstate's disciplinary policy and in contrast to the manner in which Allstate treated younger employees accused of similar conduct, coupled with the delay between the original investigation and his firing and the contradictory reports from employees regarding the severity of his conduct at the December 4, 2017 meeting, is sufficient evidence to raise an inference of pretext.  For the following reasons, we disagree.

It is true that Allstate did not strictly apply its progressive discipline policy before terminating Mr. Sanders.  However, the conduct for which Mr. Sanders was terminated, to wit, his intimidating behavior that caused Mr. Sherban to lose confidence in Mr. Sanders's ability to effectively perform his job, is conduct subject to immediate

termination under Allstate's employment policies.  Accordingly, while Allstate could have chosen to coach Mr. Sanders or give him an Unacceptable Notification for his behavior, it was not a violation of its policies to skip progressive discipline and decide instead to fire Mr. Sanders.  While Mr. Sanders points to other, younger employees he claims received lesser discipline for arguably similar or more egregious conduct, such evidence does not raise an inference of pretext because, as discussed above, those personnel decisions were made by different decisionmakers.

Nor does the fact that Allstate initially cleared Mr. Sanders after its original investigation give rise to an inference of pretext.  Allstate logically believed that the matter was closed after Mr. Soileau informed CERT during its initial investigation of the anonymous complaint that he had already addressed the issue with Mr. Sanders.  Allstate reopened the investigation only after the complaint was renewed and the anonymous complainant came forward, at which point Mr. Sherban was notified for the first time of the situation, and a broader investigation, which included employee interviews, was conducted.  Based on the information gathered during the second investigation, including reports from the majority of employees interviewed confirming that Mr. Sanders had in fact yelled and used inappropriate language at the December 4, 2017 meeting, Mr. Sherban made the final termination decision.  In this context, the delay between the original investigation into Mr. Sanders's conduct and his termination is not suspicious and does not cast doubt on the veracity of Mr. Sherban's reasons for deciding that termination was appropriate.

Finally, while it is true that some employees interviewed stated that they were not intimidated or offended by Mr. Sanders's outburst, Mr. Sherban's termination decision was reportedly based on his own loss of confidence in Mr. Sanders's ability to effectively perform in a leadership position given what he viewed as intimidating behavior.  The fact that certain employees may not themselves have felt intimidated does not cast doubt on Mr. Sherban's view of Mr. Sanders's conduct.  Although Mr. Sanders denies having done so, based on the employee interviews, Mr. Sherban was reasonably under the impression that Mr. Sanders had yelled and cursed at his co-workers and subordinates.  Because such behavior could reasonably lead a supervisor to lose confidence in an employee's ability to effectively lead, the fact that some employees may not have felt intimidated and still viewed Mr. Sanders positively does not establish pretext.  Again, "[t]he pretext inquiry focuses on the honesty—not the accuracy—of the employer's stated reason for the termination."  *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997).

For these reasons, the entirety of the evidence, whether viewed through the lens of the *McDonnell Douglas* analysis or considered as a whole, does not support a conclusion that Mr. Sanders's age was the "but for" cause of his termination.  Accordingly, Allstate is entitled to summary judgment.

## III.   Conclusion

For the reasons detailed above, Defendant's Motion for Summary Judgment is

<u>GRANTED</u>.  Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date: _____12/18/2020_____          _____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Bianca Black
LITTLER MENDELSON, P.C. (Indianapolis)
bblack@littler.com

Chad Harrison Holler
BETZ & BLEVINS
choller@betzadvocates.com

Jamie A. Maddox
BETZ & ASSOCIATES
jmaddox@betzadvocates.com

Brian Lee Mosby
LITTLER MENDELSON, P.C.
bmosby@littler.com